UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MERAULT K. ALMONOR and WILMA DORE
ALMONOR, on behalf of themselves and their infant
child, DEVIN K. ALMONOR,

**11 CIV 4121**

11 Civ. _____

                 Plaintiffs,

**COMPLAINT**

       -against-

**JURY TRIAL DEMANDED**

THE CITY OF NEW YORK, a municipal corporation;
POLICE OFFICER BRIAN DENNIS, in his individual
and official capacities; SERGEANT JONATHAN
KORABEL, in his individual and official capacities;
POLICE OFFICER MARIE DIAZ MONTEZ, in her
individual and official capacities; SERGEANT
SHARISSE SANDERS, in her individual and official
capacities; POLICE OFFICER DORIS LOPEZ, in her
individual and official capacities; POLICE OFFICER
EMANUEL CHANG, in his individual and official
capacities; and JOHN DOES 1-10 (whose identities are
currently unknown but who are known to be police
officers and/or supervisory personnel of the New York
City Police Department), in their individual and official
capacities,



                 Defendants.

-------------------------------------------------------------------X

      Plaintiffs MERAULT K. ALMONOR and WILMA DORE ALMONOR, on behalf of

themselves and their infant child, DEVIN K. ALMONOR, by their attorneys, The Law Offices

of Joel B. Rudin, and Beldock Levine & Hoffman LLP, hereby allege for their complaint against

the defendants as follows:

### PRELIMINARY STATEMENT

    1.    This is an action for money damages and injunctive and declaratory relief brought

pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, and 28 U.S.C. §§ 2201 and 2202 for violations

of the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and

under the common law and the constitution of the State of New York, against the City of New York (the "City") and police officers of the New York Police Department (the "NYPD").

2.     On March 20, 2010, NYPD Sergeant Jonathan Korabel ("Korabel") and NYPD Police Officer Brian Dennis ("Dennis") stopped, frisked, and arrested 13-year-old Devin K. Almonor ("Devin Almonor") without reasonable suspicion to do so and because he is a black person. They intentionally harmed Devin Almonor by, among other wrongful acts, belittling him when he began to cry as they transported him in handcuffs to the 30th Precinct. He was held handcuffed in police custody for more than six hours. He was never charged with any violation, misdemeanor, or felony.

3.     When Devin Almonor's mother, Wilma Dore Almonor ("Wilma Almonor"), appeared at the 30th Precinct to take him home, defendant Sergeant Sharisse Sanders ("Sanders"), without provocation, began berating her and refused to bring her and her son together. Other officers at the 30th Precinct joined their sergeant in verbally abusing Wilma Almonor, despite her repeated pleas that she wanted to see her son. Approximately six NYPD officers, including among others, Sergeant Sanders, Officer Dennis, defendant Police Officer Marie Diaz Montez ("Diaz Montez"), defendant Police Officer Doris Lopez ("Lopez"), and defendant Police Officer Emanuel Chang ("Chang"), then physically attacked Wilma Almonor: punching her in the face, throwing her to the ground, and placing her in handcuffs. She was arrested and thereafter held in police custody for approximately than 15 hours. The NYPD officers were motivated to berate, assault, arrest, and detain Wilma Almonor in part because she is a black woman.

4.     When Wilma Almonor was being attacked by the NYPD officers, her husband and Devin's father, Merault K. Almonor ("Merault Almonor"), appeared on the scene and asked why she was being assaulted. In response and without any justification, NYPD officers,

2

including but not limited to Sergeant Korabel, threw Merault Almonor to the ground and handcuffed him despite his protests that he is a retired NYPD officer and was not resisting. He was arrested and thereafter held in police custody for more than five hours. The NYPD officer were motivated to berate, assault, arrest, and detain Merault Almonor in part because he is a black man.

5.      After their arrests, Merault Almonor and Wilma Almonor were wrongfully and maliciously prosecuted.

6.      The actions of these NYPD officers in violation of the rights of the Plaintiffs reflect a culture of misconduct that has long existed at the 30th Precinct (*see*, for example, Report of Commission to Investigate Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Mollen Commission Report"), dated July 7, 1994). The current culture of misconduct is evidenced by T-shirts apparently created for and by 30th Precinct officers, which reflect a tolerance for excessive force and disrespect for members of the community. Pictures of these T-shirts are attached to this Complaint as Exhibit 1.

7.      By this action, Plaintiffs seek redress for the violations of their constitutional and civil rights and to recover damages they suffered as a result of these incidents, including but not limited to damages for legal fees, costs and expenses associated with defending the criminal proceedings against Merault Almonor and Wilma Almonor, physical injuries, loss of liberty, lost employment and wages, loss of reputation, legal fees, costs and expenses, mental anguish, pain and suffering, inconvenience, humiliation, and fear.

## JURISDICTION AND VENUE

8.      Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1343, as this action seeks redress for the violation of Plaintiffs' federal constitutional and civil rights.

9.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

10.     Plaintiffs further invoke this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over any and all state constitutional or common law claims that are so related to the claims within the original jurisdiction of this court that they form part of the same controversy. Plaintiffs have satisfied all procedural prerequisites with respect to their state law claims: Plaintiffs served a notice of claim upon the City within 90 days of the incidents underlying their Complaint and is serving supplemental notices of claim within 90 days of disposition of criminal matters, and have otherwise complied with the statutory requirements of the General Municipal Law of the State of New York. Although 30 days have elapsed since service of their initial notice of claim, the City has not adjusted or paid such claim.

11.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c).

## PARTIES

12.     Plaintiff MERAULT ALMONOR is a black man who is a resident of the State of New York, County of New York. He served the City for 20 years, first as a corrections officer and then as a police officer. He is the father of Devin Almonor. He brings this suit on behalf of himself and his son Devin Almonor.

13.     Plaintiff WILMA ALMONOR is a black woman who is a resident of the State of New York, County of New York. She is the mother of Devin Almonor and the daughter of a NYPD detective. She brings this suit on behalf of herself and her son Devin Almonor.

14.     DEVIN ALMONOR is a black youth, currently 14 years of age. He is a resident of the State of New York, County of New York. At the time of the incidents alleged herein, he

4

was 13 years old. Devin resides in and visits neighborhoods where NYPD officers are, have been, and will be deployed, and where said officers have conducted and will conduct stops and frisks.

15.     Defendant THE CITY is a municipal entity created and authorized under the laws of the State of New York. It is authorized under the laws of the State of New York to maintain a police department, the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers. The NYPD's operations include the operations as described herein. On information and belief, the law enforcement activities of the NYPD are funded, in part, by the federal government.

16.     Defendant DENNIS is or was at all relevant times a police officer with the NYPD. He is sued in his individual and official capacities.

17.     Defendant KORABEL is or was at all relevant times a sergeant with the NYPD. He is sued in his individual and official capacities

18.     Defendant DIAZ MONTEZ is or was at all relevant times a police officer with the NYPD. She is sued in her individual and official capacities.

19.     Defendant SANDERS is or was at all relevant times a sergeant with the NYPD. She is sued in her individual and official capacities.

20.     Defendant LOPEZ is or was at all relevant times a police officer with the NYPD. She is sued in her individual and official capacities

21.     Defendant CHANG is or was at all relevant times a police officer with the NYPD. He is sued in his individual and official capacities

5

22.     Defendants John Does 1-10 are or were at all relevant times police officers with the NYPD. They are sued in their individual and official capacities.

23.     At all times relevant, defendants Sergeant Sanders, Sergeant Korabel, Officer Dennis, Officer Diaz Montez, Officer Lopez, Officer Chang, and John Does 1-10 (collectively the "Individual Officer Defendants") acted under color of state law in the course and scope of their duties and functions as agents, employees, and officers of the City and the NYPD.

## FACTUAL ALLEGATIONS

24.     In the afternoon of Saturday, March 20, 2010, Devin Almonor was at his home on Riverside Drive between West 139th and West 140th Streets with a friend playing video games.

25.     At approximately 8:30 p.m., Devin Almonor walked with his friend, who was going home, to a nearby bus stop on West 145th Street.

26.     After Devin Almonor's friend boarded the bus, Devin Almonor walked toward Hamilton Place to meet his older brother, Merault Almonor, Jr. ("Merault Jr."), at a local bodega. Merault Jr. was 15 years old at the time.

27.     At around 9:00 p.m., Devin Almonor neared the bodega and began to lawfully cross the street toward the bodega by walking through the designated pedestrian crosswalk.

28.     A dark, unmarked car came upon Devin Almonor and stopped in the street between him and the bodega. Inside were NYPD police officers (Sergeant Korabel and Officer Dennis) dressed in plain clothes.

29.     Although they lacked any reasonable suspicion to stop and frisk Devin Almonor, that is exactly what Sergeant Korabel and Officer Dennis did.

30.     Sergeant Korabel and Officer Dennis exited their vehicle and approached Devin Almonor.

6

31.    Sergeant Korabel and Officer Dennis asked Devin Almonor for his name, his age, and where he lived. Devin Almonor answered their questions. He told them, among other things, that he was 13 years old.

32.    Sergeant Korabel and Officer Dennis then asked him where he was going while searching him, although they lacked any reasonable suspicion to do so. Devin Almonor answered their questions. He told them among other things that he lived two blocks away.

33.    At the time of the stop and just prior to that time, Devin Almonor was not engaged in any action or conduct that would have permitted a reasonably objective police officer to believe they had reasonable suspicion to stop or frisk him. He was not acting disorderly, was not engaged in the commission of any violation, misdemeanor, or felony, had no weapons or drugs on his person, and was dressed in ordinary casual clothing. At all times during the stop, Devin Almonor cooperated with the police officers.

34.    Upon information and belief, Sergeant Korabel and Officer Dennis stopped and frisked Devin Almonor without reasonable suspicion and because he is a black youth.

35.    After frisking Devin Almonor, but having found no weapons or drugs on his person and without any cause, Sergeant Korabel and Officer Dennis handcuffed him and placed him in the back of the vehicle.

36.    As this was occurring, Merault Jr. exited the bodega and saw the officers handcuffing Devin Almonor and placing him in the back of their unmarked vehicle.

37.    Merault Jr. approached and asked for the officers' names, but Sergeant Korabel and Officer Dennis refused to provide them. Merault Jr. told the officers that his father was a retired NYPD officer. Sergeant Korabel said to him, "Well, I'm a Sergeant," or words to that

effect. Sergeant Korabel and Officer Dennis told him to tell his father to pick up Devin Almonor at the 30th Precinct.

38.     Sergeant Korabel and Officer Dennis proceeded to drive Devin Almonor to the 30th Precinct. Officer Dennis sat in the back of the car beside Devin Almonor. When Devin Almonor began to cry, Officer Dennis engaged in conduct with the intent to humiliate and embarrass him, including asking him why he was crying like a little girl, or words to that effect.

39.     Sergeant Korabel and Officer Dennis completed a stop, question, and frisk report, known as a UF-250, which contained information that they knew was false, including that Devin Almonor fit the description of a suspect.

40.     Upon arriving at the 30th Precinct, Sergeant Korabel and Officer Dennis brought Devin Almonor to the front desk and Officer Dennis falsely told Sergeant Sanders that they picked up Devin Almonor because he thought Devin Almonor had a gun. Sergeant Korabel and Officer Dennis had already frisked Devin Almonor in their street encounter and knew he did not have a gun.

41.     Officer Dennis proceeded to take Devin Almonor to the juvenile holding room and handcuffed him to a bar, where he remained until he was released.

42.     Devin Almonor, who was frightened, asked to call his parents but his request was denied.

43.     At some point after his arrest, the NYPD called Devin Almonor's mother Wilma Almonor and left a voicemail on her cell phone advising her that Devin Almonor was in their custody and requesting that she retrieve him.

44.     Wilma Almonor arrived at the 30th Precinct at around 10:00 p.m. and informed the desk officer that she was there to pick up her son.

45.     Upon information and belief, there were no other juveniles being held at the 30th Precinct at that time.

46.     Sergeant Sanders, who was standing behind the desk officer further into the room, said to Wilma Almonor that she should calm down or words to that effect. Approximately five minutes had elapsed since Wilma Almonor arrived at the 30th Precinct, and Wilma Almonor had not during that time acted in an inappropriate or disorderly manner.

47.     In response to Sergeant Sanders' comment, Wilma Almonor stated that she wanted to know her son's whereabouts or words to that effect.

48.     Instead of taking Wilma Almonor to see Devin Almonor, or releasing Devin Almonor into Wilma Almonor's custody, Sergeant Sanders threatened to force Wilma Almonor out of the precinct.

49.     Wilma Almonor stated words to the effect that she wanted to know her son's whereabouts, that she would not leave without her son, and that she questioned the officers' authority to hold her son or to force her to leave.

50.     Sergeant Sanders and Officer Dennis said to Wilma Almonor words to the effect that she would not be permitted to see her son and would be arrested if she continued making statements questioning their authority.

51.     Officer Dennis said to Wilma Almonor that she was "an animal," or words to that effect.

52.     Wilma Almonor repeated that she wanted to know her son's whereabouts, that she would not leave without her son, and that she questioned the officers' authority to hold her son or to force her to leave, or words to that effect.

53.     Without warning or justification, approximately six NYPD officers, including but not limited to Sergeant Sanders, Officer Dennis, Officer Diaz Montez, Officer Lopez, Officer Chang and John Does 1-10, attacked Wilma Almonor. Officer Diaz Montez punched Wilma Almonor in the face. Officer Chang pulled her backward by her neck. The officers wrestled her to the ground. At least one officer placed his or her knee onto Wilma Almonor's back. An officer stood on each of Wilma Almonor's hands. Another officer began to put Wilma Almonor in handcuffs. At least two officers, including but not limited to Officers Diaz Montez and Lopez, was laughing while this attack transpired.

54.     At no point had Wilma Almonor acted in a disorderly or inappropriate manner. At no point had Wilma Almonor been a threat to the safety of the officers or to the public.

55.     Devin Almonor, still in the juvenile room, heard the interaction between his mother and the officers of the 30th Precinct. At first he was relieved and comforted to hear that his mother had arrived. When he heard the officers scuffling with his mother, however, he became frightened and began to cry. He heard his mother saying repeatedly "I didn't do anything." He heard Sergeant Sanders and Officer Dennis verbally abusing his mother. He feared for his own safety and the safety of his mother.

56.     In the midst of the officers' attack on Wilma Almonor, Merault Almonor, who had been parking the car, entered the room. Merault Almonor asked what was happening and why the officers were attacking his wife. The officers, including but not limited to Sergeant Korabel and John Does 1-10, turned on him, threw him to the ground, and placed him in handcuffs. In response, Merault Almonor stated loudly and repeatedly "I am a cop and I am not resisting arrest."

10

57.     The officers placed Wilma Almonor and Merault Almonor under arrest and placed them in handcuffs.

58.     The officers strip-searched Wilma Almonor and brought her to a holding cell within the 30th Precinct. Paramedics were called because of her injuries and she was brought to the hospital.

59.     Merault Almonor was seated, with handcuffs, in a waiting room.

60.     Realizing that both of his parents were now under arrest, Devin Almonor became despondent and more frightened.

61.     Devin Almonor was held in police custody in handcuffs for approximately six hours. He was released into the custody of his uncle.

62.     Devin Almonor was never charged with any violation, misdemeanor, or felony.

63.     Wilma Almonor was held at the 30th Precinct until the following Monday at approximately 1:00 a.m. She was held in police custody for approximately 15 hours. She was charged with trespassing.

64.     Wilma Almonor was later indicted for disorderly conduct, resisting arrest, and criminal trespass in the third degree.

65.     Wilma Almonor, who was required to appear in court on various dates, went to trial on or about April 5, 2011.

66.     Wilma Almonor was acquitted of disorderly conduct. The jury, voting 11-1 for acquittal, did not reach a verdict on the charge of resisting arrest, and the District Attorney later dismissed that charge. The jury found her not guilty of criminal trespass in the third degree.

67.     The jury returned a verdict against Wilma Almonor for the lesser included violation of trespass.

68.     Merault Almonor was released after being held in police custody for approximately five hours. He was issued a desk appearance ticket for obstruction of governmental administration.

69.     Merault Almonor was later indicted for assault in the second and third degree and obstruction of governmental administration in the second degree.

70.     Merault Almonor, who was required to appear in court on various dates, went to trial on or about April 5, 2011.

71.     Merault Almonor was acquitted of all charges.

72.     As a result of said incidents, Plaintiffs variously suffered damages including but not limited to damages for legal fees, costs and expenses associated with defending the criminal proceedings against Merault Almonor and Wilma Almonor, physical injuries, loss of liberty, lost employment and wages, loss of reputation, legal fees, costs and expenses, mental anguish, pain and suffering, inconvenience, humiliation, and fear.

## JOINT VENTURE AND CONSPIRACY

73.     At all times relevant herein, the Individual Officer Defendants were engaged in a joint venture. The Individual Officer Defendants assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during the said events.

74.     The actions of the Individual Officer Defendants violated Plaintiffs' clearly established and well settled federal constitutional rights, including but not limited to their First Amendment rights to freedom of speech, their Fourth Amendment rights to be free from unreasonable searches and seizures, and their Fifth and Fourteenth Amendment rights to substantive and procedural due process and equal protection under the law.

12

## MUNICIPAL LIABILITY

### The NYPD's History of a Policy, Practice, and/or Custom of
### Suspicionless Stops and Frisks of Black People

75.    The NYPD has a history of conducting suspicionless stops and frisks which traces back to the formation of the Street Crime Unit ("SCU") in the 1970's.

76.    The SCU was an elite, commando-like squad of police officers whose self-proclaimed mission was to interdict violent street crime in New York City and, in particular, to remove illegal firearms from the streets.

77.    The SCU was little noticed until then Mayor Rudolph Giuliani ("Mayor Guiliani") took office in 1994. Giuliani had campaigned on a promise of more aggressive law enforcement and the SCU became a centerpiece of his anti-crime strategy once he took office.

78.    The SCU predominantly consisted of white officers who were deployed to areas largely populated by minorities. The determinative factor in the SCU's decision to stop and frisk civilians was often race or national origin and without the suspicion required under the Fourth Amendment.

79.    The SCU's policy, practice, and/or custom of suspicionless stops and frisks lead to the massive deprivation of New Yorkers' constitutional rights. In 1997, the SCU reported over 18,000 stops and risks but less than 5,000 arrests. The next year, the SCU reported a 50% increase in stops and frisks but even fewer arrests. The SCU's own figures revealed that over 35,000 law abiding people were stopped and frisked over a two year period.

80.    In 1999, the Office of the Attorney General ("OAG") conducted an investigation and released a study of the NYPD's stop and frisk practices for the period of January 1, 1998,

through March 31, 1999, which concluded that there was evidence of racial disparities and disparate impact on the basis of race.

81.    Analyzing the stop and frisk data for the time period from January 1998 through March 1999, the OAG found that although blacks comprised 25.6% of the City's population and Hispanics 23.7%, these two groups made up 83.6% of all stops by the NYPD. By contrast, whites were 43.4% of the City's population, but accounted for only 12.9% of all stops.

82.    In precincts where black and Hispanic persons each represented less than 10% of the total population, individuals identified as belonging to these racial groups accounted for more than half (53.4%) of the stops in these precincts. The rate at which stops led to arrests also differed by race: only 1 out of 9.5 stops of blacks, 1 out of 8.8 stops of Hispanics, and 1 out of every 7.9 stops of whites resulted in an arrest. These stop to arrest rates demonstrated that the stops of whites were more likely to lead to arrests, whereas those for blacks were more indiscriminate because fewer of the persons stopped in these broader sweeps were actually arrested.

83.    The OAG also found that when examining the crime rate statistics from the New York Division of Criminal Justice Services ("DCJS") during this time period, blacks were stopped 23% more often than whites; Hispanics were stopped 39% more often than whites. The OAG also estimated that SCU officers completed a UF-250 form (*i.e.*, the form on which all NYPD officers are required to record information about a stop and frisk) for only 10%-20% of the stops and frisks they conducted.

84.    In 1999, a class action lawsuit, *Daniels, et al. v. The City of New York, et al.*, ("*Daniels*"), was filed to challenge the NYPD's unconstitutional policy, practice, and/or custom of conducting widespread stops and frisks of individuals without the reasonable articulable

suspicion required under the Fourth Amendment, and which impermissibly used race and/or national origin, and not reasonable suspicion, as the determinative factor in deciding to stop and frisk individuals.

85.     In 2003, a settlement was reached in *Daniels* which resulted in a stipulation that required the NYPD to, *inter alia*, adopt a written policy prohibiting unlawful racial profiling. The stipulation also required the NYPD to produce quarterly data concerning the NYPD stop and frisk activity.

86.     During the pendency of *Daniels*, the NYPD claimed it had disbanded the SCU. However, the unlawful practices used by the NYPD through the SCU have continued, through other methods, as part of the NYPD's anti-crime strategy.

87.     In 2008, a successor lawsuit, *Floyd, et al. v. The City of New York, et al.*, Case No. 08 Civ. 1034 (SAS) ("*Floyd*"), was filed as a putative class action, challenging the NYPD policies enumerated herein as unconstitutional. That case is currently pending.

88.     An analysis of the UF-250 data provided by the NYPD, as required under the *Daniels* stipulation and as produced in *Floyd*, for the last quarter of 2003 and all quarters for 2004, 2005, 2006 2007, 2008 and 2009, reveal non-compliance with the written policy prohibiting unlawful racial profiling. The UF-250 data for the years 2003 through 2006 indicates persistent racial disparities in police activities in conducting stops and frisks.

89.     The UF-250 data shows that in 2006 alone the NYPD stopped, questioned and/or frisked 506,491 people, a remarkable 520% increase from a total of 97,296 in 2002.  In 2006, nearly 90% of those stopped and frisked were black or Latino, even though these groups make up approximately 52% of the City's population. Only 10% of those stops led to summonses or arrests, indicating a lack of reasonable suspicion. These racial disparities have only increased

consistently over time. The increase in the percentage of stops targeting blacks has been steady and substantial, with 48% of the stops in 2003; 50% in 2004; 51% in 2005; and 53% in 2006.

90.     The 2006 UF-250 data also shows evidence of racial disparities in the frisks conducted by the NYPD of black and white suspects. In 2004, 45% of black suspects who were stopped were subjected to being frisked, as compared to 29% of whites.  In 2005, 47% of all black suspects who were stopped were frisked, as compared to 27% of whites. In 2006, 46% of all blacks who were stopped were frisked, as compared with 29% of whites. Moreover, the outcome of these frisks varied substantially by race.  In 2006, 13% of whites who were frisked were arrested, as compared with 7% of blacks.  The significantly lower percentage of frisks which lead to an arrest for blacks indicates that these actions are more indiscriminate and demonstrates pretext through a lack of reasonable suspicion because the stops of whites are actually more likely to lead to arrests.

91.     The UF-250 data for 2006 also shows racial disparities in the use of force: blacks were more likely to have physical force applied during the stop, but less likely to be arrested if subjected to physical force.  The racial differences in the use of physical force are significant: 15% of whites stopped in 2006 experienced any physical force as compared with 21% of blacks. This difference does not correspond to the likelihood of arrest for those on whom force is used. Among all whites who were subjected to physical force in 2006, 12% were arrested; among blacks, 14% were arrested.

92.     According to the data, in 2006 the most common reason provided for stopping blacks was on suspicion of a weapons crime. However, the percentage of weapons related stops that actually lead to recovery of a weapon is remarkably small: only 2%. Thus, the most frequent

reason for stopping blacks has one of the lowest yields for uncovering what the stop is intended to find, establishing a practice of intentional racially based policing.

93.     The low yield of weapons for stops of blacks is also significant because of the racial disparities in the yield for weapons stops: When stopped, 45% of blacks and Latinos were frisked as compared to 29% of white suspects even though white suspects were 70% more likely than black suspects to have a weapon. While officers are nearly twice as likely to find contraband when frisking or searching white suspects as black suspects, 45% of black suspects and only 29% of white suspects were subjected to an intrusive frisk. In 2009 only 1.3 % of all stops resulted in the discovery of a weapon, and only 6% of the stops resulted in arrests. A finding that searches of minorities are less productive than searches of whites is statistically significant and indicates that police have a lower threshold of "cause" when searching minorities and shows differential treatment of minorities that produces a disparate impact.

94.     UF-250 data also shows that blacks are more likely to be stopped for subjective reasons which allow for officers to conduct stops based on racial bias. While some subjective reasons are justified under the Fourth Amendment, stops based predominantly on race are constitutionally impermissible, and ambiguous reasons for stops are often pretext for race based profiling.

95.     For example, in 2006, blacks were more commonly stopped for furtive movements or suspicious bulges than whites. The differential treatment of suspects based on race is legally impermissible.

96.     On information and belief, NYPD officers are also under pressure to conduct increased stops and frisks. On information and belief, reports of an officer's stop and frisk activity are tracked and evaluated at the NYPD's weekly CompStat meetings where commanders

are questioned about their precinct's crime statistics, giving NYPD officers a strong incentive to conduct suspicionless stops and frisks.

97.     Public accounts provide further evidence of unlawful stops and frisks that lack the reasonable suspicion required by the Fourth Amendment and reveal intent to discriminate on the basis of race.

98.     For example, on October 10, 2006, the *Daily News* reported that NYPD officers reported that they were given a roll call order by Captain Michael Vanchieri to stop, question and frisk all black males at the Seventh Avenue Park Slope subway station in Brooklyn after he described a series of robberies on the F subway line in Brooklyn that was concentrated near that station. This directive prompted calls by One Hundred Blacks in Law Enforcement and the National Latino Officers Association for an investigation of police commands that were indicative of racial profiling.

99.     For another example, on March 1, 2010, NYPD Officer Adhyl Polanco told ABC news that the NYPD imposes quotas for arrests and the issuance of summonses.

100.     For another example, in articles on May 4 and 11, 2010, Graham Rayman reported in the Village Voice that NYPD Officer Adrian Schoolcraft told him about the NYPD's imposition of quotas.

101.     A report by the New York City Civilian Complaint Review Board ("CCRB") also shows that incidents of unlawful stops and frisks have risen dramatically since 1999. The CCRB reported that in 1999, 1,240 individuals made complaints of being subjected to stops and frisks in contravention of police authority. In 2006, the complaints for improper stops and frisks totaled 5,089; the overall total for complaints made for that year was 7,669. According to the CCRB, the

substantiation rate for allegations of unlawful stops and frisks was at least more than twice the rate for any other allegation made from 2002 through 2006.

### The NYPD's Suspicionless Stop and Frisk Regime is a Direct and Proximate Result of the Polices, Practices, and/or Customs of the City

102.    The Fourth Amendment prohibits police officers from conducting stops and frisks without a reasonable, articulable suspicion of criminal conduct; frisking persons without a reasonable belief that they are armed or presently dangerous; searching and seizing persons without probable cause; or using excessive force in the course of policing activities.

103.    The Equal Protection Clause of the Fourteenth Amendment bars police officers from targeting individuals for stops and frisks on the basis of race or national origin.

104.    The pervasive unconstitutional practices of the NYPD are a direct and proximate result of policies, practices and/or customs devised, implemented, enforced and sanctioned by the City with the knowledge that such policies, practices and/or customs will lead to violations of the Fourth and Fourteenth Amendment rights of New Yorkers. Those policies, practices and/or customs include: (a) failing to properly screen, train and supervise NYPD officers; (b) failing to adequately monitor and discipline NYPD officers; and (c) encouraging, sanctioning and failing to rectify the NYPD's custom and practice of suspicionless stops and frisks.

105.    Specifically, with respect to the failure to properly screen, train and supervise NYPD officers:

> a. Although fully aware that the work of the NYPD demands extensive training, superior judgment and close supervision, the City failed to properly screen, train and supervise NYPD officers knowing that such failures would result in Fourth and Fourteenth Amendment violations.
>
> b. Pursuant to the Stipulation of Settlement in *Daniels*, the City was required to implement numerous and specific trainings on the written policy prohibiting racial profiling. Defendants have failed to properly train and supervise NYPD

officers, including supervisors, concerning the legal and factual bases for conducting stops and frisks in compliance with the Fourth and Fourteenth Amendments.

c. The inadequate screening, training and supervision of the NYPD is a direct and proximate cause of the NYPD's widespread unconstitutional stops and frisks. As a direct and proximate result of the Defendants' failure to screen, train and supervise NYPD officers, tens of thousands of people have been subjected to unlawful stops and frisks, many times simply because of their race and/or national origin. By failing to properly screen, train and supervise NYPD officers, the City has acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the NYPD.

106. Specifically, with respect to the failure to monitor and discipline NYPD officers:

a. The City knowingly, deliberately, and recklessly has failed to take appropriate disciplinary action and corrective measures against NYPD officers who have engaged in suspicionless stops and frisks.

b. The City knowingly, deliberately, and recklessly has failed to adequately monitor NYPD officers who have incurred a substantial number of civilian complaints, even in instances where the number of complaints should have triggered monitoring under established departmental guidelines.

c. The City knowingly, deliberately, and recklessly has failed to devise and implement appropriate oversight, disciplinary and remedial measures in the face of extensive evidence that no charges are brought against the overwhelming majority of persons stopped and frisked by NYPD officers.

d. The City knowingly, deliberately, and recklessly has failed to conduct adequate auditing to determine if the stops and frisks conducted by NYPD officers comply with the NYPD's written policy prohibiting stops and frisks where race and/or national origin is the determinative factor in initiating police action.

e. The City knowingly, deliberately, and recklessly has failed to take sufficient steps to curb NYPD officers' non-compliance with departmental directives requiring that UF-250 forms be completed for each stop and frisk.

f. The City knowingly, deliberately, and recklessly has failed to take sufficient corrective and remedial action against NYPD officers who provide fabricated, false, or impermissible justifications for stops and frisks.

g. The City knowingly, deliberately, and recklessly has failed to take sufficient corrective, disciplinary and remedial action to combat the so-called "blue wall of silence," wherein NYPD officers regularly conceal or fail to report police misconduct, *inter alia*, in sworn testimony, official reports, statements to the CCRB and the Internal Affairs Bureau, and in public statements.

h. The City failed to properly and adequately monitor, discipline and take necessary corrective action against NYPD officers knowing that such omissions would lead to Fourth and Fourteenth Amendment violations.

i. By such acts and omissions, the City has acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the NYPD.

107. Specifically, with respect to encouraging, sanctioning and failing to rectify the NYPD's custom and practice of suspicionless stops and frisks:

a. With the knowledge that such acts and omissions would create a likelihood of Fourth and Fourteenth Amendment violations, the City has encouraged, sanctioned and failed to rectify the NYPD's abusive and unconstitutional practices.

b. For example, these defendants, upon information and belief, have enacted and enforced unwritten or de facto quotas, productivity quotas, or productivity standards mandating a certain number of stops and frisks and specific types of arrests per month for each NYPD officer. Upon information and belief, NYPD officers who fail to meet the productivity standards face adverse employment consequences. In their efforts to satisfy the productivity standards, NYPD officers have engaged in widespread suspicionless stops and frisks of black individuals.

c. As a direct and proximate result of the above policies, practices and/or customs, tens of thousands of people have been, and will continue to be, subjected to unconstitutional stops, frisks, searches and seizures by NYPD officers, sometimes in violent encounters, simply because such individuals happen to be the wrong color in the wrong place at the wrong time.

d. Through such acts and omissions, the City has acted recklessly and with deliberate indifference to the constitutional rights of individuals who would come into contact with the NYPD.

**The NYPD's Recent Measures are Inadequate and Insufficient to
Eradicate, Curb, or Deter the Suspicionless Stop and Frisk Regime**

108.    Pursuant to the Stipulation in *Daniels*, the City and the NYPD were required to implement a written policy which prohibits unconstitutional racial or ethnic/national origin profiling.

109.    As explained herein, defendants have violated that written policy.

110.    Pursuant to the Stipulation in *Daniels*, the City and the NYPD were also required, *inter alia*, to: (a) supervise, monitor and train officers and supervisors regarding the policy prohibiting unlawful racial profiling; (b) to conduct supervision and monitoring of the policy through audits by the NYPD Quality Assurance Division that determine whether, and to what extent, the audited stop and frisk activity is based upon reasonable suspicion; (c) to require that NYPD officers and supervisors document stop, question and frisk activity in UF-250 forms, memo books, logs and monthly activity reports; and (d) to conduct public information and outreach through community forums, high school workshops and distribution of materials informing the public about their rights concerning stop, question and frisk encounters and making complaints about concerns arising from a stop, question and/or frisk encounter with the police.

111.    Upon information and belief, defendants did not perform many of these requirements.

112.    Moreover, none of these measures sufficiently or adequately addressed (much less irrevocably eradicated, curbed or deterred) the NYPD's pervasive policy, practice and/or custom of unconstitutional stops and frisks.

113.    Thus, despite these initiatives, Devin Almonor, and hundreds of thousands of other individuals, continue to face the imminent likelihood of becoming victims of the NYPD's constitutional abuses in violation of the United States and New York State constitutions.

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourth Amendment Violations
### *On Behalf of Devin K. Almanor for Suspicionless Stop and Frisk*
### (Against the City, Dennis and Korabel)

114.    Plaintiffs repeat and re-allege paragraphs 1 through 113 as if fully set forth herein.

115.    Defendants the City, Sergeant Korabel and Officer Dennis have implemented, enforced, encouraged, and sanctioned a policy, practice and/or custom of stopping and frisking people of color without reasonable articulable suspicion of criminal conduct as required by the Fourth Amendment. These constitutional abuses are coupled with unconstitutional searches and seizures, arrests, and, at times, excessive force, all of which occurred in this case.

116.    The NYPD's constitutional abuses and violations, including the violations of Devin Almonor's rights, were, and are, directly and proximately caused by the policies and/or customs devised, implemented, enforced, encouraged and sanctioned by the City, including: (a) the failure to adequately and properly screen, train, and supervise NYPD officers; (b) the failure to adequately and properly monitor and discipline NYPD officers; and (c) the overt and tacit encouragement and sanctioning of, and failure to rectify, the NYPD's suspicionless stop and frisk practices.

117.    Sergeant Korabel and Officer Dennis stopped and frisked Devin Almonor on the basis of his race and without reasonable articulable suspicion that he had engaged in, was about to engage in, or was in the process of engaging in criminal conduct, and they did so in

accordance with the policies and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City as described herein.

118.     Defendants the City, Sergeant Korabel and Officer Dennis each acted with deliberate indifference to the Fourth Amendment Rights of Devin Almonor and other New Yorkers of color.

119.     As a direct and proximate result of the acts and omissions of each of the aforementioned defendants, Devin Almonor's Fourth Amendment rights were violated.

120.     By acting under color of state law to deprive Devin Almonor of his rights under the Fourth Amendment, these defendants violated 42 U.S.C. § 1983.

121.     Moreover, The NYPD targets black individuals for illegal stops and frisks where Devin Almonor resides and in areas he is likely to visit in the future. Thus, there is a real and immediate threat that Devin Almonor's Fourth Amendment rights will be violated by NYPD officers in the future. Because the policies, practices, and/or customs of the City subject Devin Almonor to stops and frisks without any reasonable, articulable suspicion of criminality and on the basis of his race, Devin Almonor cannot alter his behavior to avoid the NYPD's future violations of his constitutional and civil rights. As a result, Devin Almonor has no adequate remedy at law for future violations of his constitutional and civil rights and will suffer serious and irreparable harm to his constitutional rights unless defendants are enjoined from continuing the NYPD's policy, practice, and/or custom of unconstitutional stops and frisks, and the policies, practices, and/or customs that have directly and proximately caused such abuses.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 –Fourteenth Amendment Violations
### *On Behalf of Devin K. Almonor for Violations of his Equal Protection Rights*
### (Against the City, Dennis and Korabel)

122.    Plaintiffs repeat and re-allege paragraphs 1 through 121 as if fully set forth herein.

123.    Defendants the City, Sergeant Korabel, and Officer Dennis have implemented, enforced, encouraged, and sanctioned a policy, practice and/or custom of stopping and frisking people of color without reasonable articulable suspicion of criminal conduct as required by the Fourth Amendment and based solely on their race or national origin. These suspicionless stops have been and are being predominantly conducted on black and Latino individuals on the basis of race and/or national origin profiling. As a result, the NYPD's policy, practice, and/or custom of suspicionless stops and frisks violates the Equal Protection Clause of the Fourteenth Amendment.

124.    The NYPD's constitutional abuses and violations, including the violations of Devin Almonor's rights, were, and are, directly and proximately caused by the policies and/or customs devised, implemented, enforced, encouraged and sanctioned by the City, including: (a) the failure to adequately and properly screen, train, and supervise NYPD officers; (b) the failure to adequately and properly monitor and discipline NYPD officers; and (c) the overt or tacit encouragement and sanctioning of or failure to rectify the NYPD's use of racial and/or national origin profiling in conducting such stops and frisks.

125.    Defendants the City, Sergeant Korabel, and Officer Dennis each acted with deliberate indifference to the Fourteenth Amendment Rights of Devin Almonor and other New Yorkers of color.

126.     As a direct and proximate result of the acts and omissions of each of the aforementioned defendants, Devin Almonor's Fourteenth Amendment rights were violated.

127.     By acting under color of state law to deprive Devin Almonor of his rights under the Fourteenth Amendment, these defendants violated 42 U.S.C. § 1983.

128.     Moreover, The NYPD targets black individuals for illegal stops and frisks where Devin Almonor resides and in areas he is likely to visit in the future. Thus, there is a real and immediate threat that Devin Almonor's Fourteenth Amendment rights will be violated by NYPD officers in the future. Because the policies, practices, and/or customs of the City subject Devin Almonor to stops and frisks without any reasonable, articulable suspicion of criminality and on the basis of his race, Devin Almonor cannot alter his behavior to avoid the NYPD's future violations of his constitutional and civil rights. As a result, Devin Almonor has no adequate remedy at law for future violations of his constitutional and civil rights and will suffer serious and irreparable harm to his constitutional rights unless defendants are enjoined from continuing the NYPD's policy, practice, and/or custom of unconstitutional stops and frisks, and the policies, practices, and/or customs that have directly and proximately caused such abuses.

### THIRD CAUSE OF ACTION
**42 U.S.C. § 1983 – First Amendment Violations**
***On Behalf of Merault K. Almonor and Wilma Dore Almonor for***
***Violations of Their Freedom of Speech***
**(Against the Individual Officer Defendants)**

129.     Plaintiffs repeat and re-allege paragraphs 1 through 128 as if fully set forth herein.

130.     Merault Almonor and Wilma Almonor each were aware of their constitutional right to voice public disapproval of police activity without fear of arrest or assault by any police officer.

131. The duties of NYPD police officers include the duty to protect the constitutional rights of persons who wish to express their opinions publicly in a lawful manner.

132. On the night of the incidents alleged herein, Wilma Almonor was told her son was in police custody and she was not permitted to see him. She said words to the effect that she believed she was entitled to see her son and that she disapproved of police officers' refusal to let her do so.

133. On the night of the incidents alleged herein, Merault Almonor witnessed police officers attacking his wife. He questioned why his wife was under attack by police, or words that effect.

134. Wilma Almonor and Merault Almonor each intended their statements to be public and for onlookers to hear them.

135. In response to Wilma Almonor's statements, approximately six NYPD police officers, including Sergeant Sanders, Officer Dennis, Officer Diaz Montez, Officer Lopez, Officer Chang, and John Does 1-10, physically and verbally attacked and arrested her.

136. In response to Merault Almonor's statements, NYPD police officers, including but not limited to Sergeant Korabel and John Does 1-10, physically and verbally attacked and arrested him.

137. None of the NYPD officers present attempted to intervene or stop the physical and verbal attacks on Wilma Almonor and Merault Almonor.

138. By virtue of the foregoing, the Individual Officer Defendants each deprived Plaintiffs of their First Amendment rights under the United States Constitution to freedom of speech and are liable to Plaintiffs under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourth Amendment Violations
### *On Behalf of all Plaintiffs for Unreasonable Seizures and False Arrest*
### (Against the Individual Officer Defendants)

139.    Plaintiffs repeat and re-allege paragraphs 1 through 138 as if fully set forth herein.

140.    While in the course of their duties and acting under color of law, the Individual Officer Defendants effectuated seizures and arrests of Merault Almonor, Wilma Almonor, and Devin Almonor without reasonable articulable suspicion of criminal activity, probable cause, or warrants.

141.    The Individual Officer Defendants held and imprisoned each of the plaintiffs in NYPD custody without cause and for extended periods of time.

142.    Plaintiffs did not consent to being held.

143.    The Individual Officer Defendants lacked privilege to arrest Plaintiffs.

144.    By virtue of the foregoing, the Individual Officer Defendants each deprived Merault Almonor, Wilma Almonor, and Devin Almonor of their rights under the Fourth Amendment and are liable to Plaintiffs under 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourth Amendment Violations
### *On Behalf of all Plaintiffs for Excessive Force*
### (Against the Individual Officer Defendants)

145.    Plaintiffs repeat and re-allege paragraphs 1 through 144 as if fully set forth herein.

146.    While in the course of their duties and while acting under color law, Sergeant Sanders, Officer Dennis, Officer Diaz Montez, Officer Lopez, Officer Chang, and John Does 1-10 effected a seizure and arrest of Wilma Almonor by intentionally using physical force against her, including but not limited to punching Wilma Almonor in the face, pulling her backward by the neck, throwing her to the ground, stomping on her back, and handcuffing her.

28

147.    While in the course of their duties and while acting under color law, Sergeant Korabel and John Does 1-10 effected a seizure and arrest of Merault Almonor by intentionally using physical force against him, including but not limited to throwing him to the ground and handcuffing him.

148.    While in the course of their duties and while acting under color law, Sergeant Korabel, Officer Dennis, and John Does 1-10 effected a seizures and arrest of Devin Almonor by intentionally using physical force against him, including but not limited to handcuffing him while transporting him to the 30th Precinct and handcuffing him to a bar at the 30th Precinct. At the time Devin Almonor was handcuffed and during the time he continued to be handcuffed, defendants did not have reason to suspect that he had committed a violation, misdemeanor, or felony, and they had no cause to arrest him.

149.    At the time of Plaintiffs' seizures and arrests, none posed a threat to the safety of the individual police officers present or to the public.

150.    The physical attacks of the Individual Officer Defendants on Merault Almonor and Wilma Almonor were objectively unreasonable.

151.    The handcuffing of Merault Almonor, Wilma Almonor, and Devin Almonor by the Individual Officer Defendants was objectively unreasonable.

152.    The Individual Officer Defendants' use of physical force caused Wilma Almonor injuries including but not limited to a swollen nose, swollen lips, chipped teeth, bruising on her face, arms, torso, and knees, pain in her jaw, injuries to her arm that required her to wear a brace for approximately one year, injuries to her right knee requiring physical therapy and medication, and emotional distress.

29

153.    The Individual Officer Defendants' use of physical force caused Merault Almonor injuries including but not limited to bruising his wrists, headaches, and emotional distress.

154.    The Individual Officer Defendants' use of physical force caused Devin Almonor injuries including but not limited to bruising his wrists and emotional distress.

155.    By virtue of the foregoing, the Individual Officer Defendants each deprived Plaintiffs of their Fourth Amendment rights under the United States Constitution to be free from unreasonable searches and seizures of their persons and are liable to Plaintiffs under 42 U.S.C. § 1983.

**SIXTH CAUSE OF ACTION**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violations**
***On Behalf of Merault K. Almonor and Wilma Dore Almonor for Malicious Prosecution***
**(Against the Individual Officer Defendants)**

156.    Plaintiffs repeat and re-allege paragraphs 1 through 155 as if fully set forth herein.

157.    The Individual Officer Defendants initiated and caused, and/or caused the initiation and the continuation, of the prosecutions of Merault Almonor and Wilma Almonor intentionally, willfully, and with malice, and without probable cause.

158.    The Individual Officer Defendants engaged in a continuing course of conduct after the March 20, 2010 arrests to deprive Merault Almonor and Wilma Almonor of their liberty by, *inter alia*, knowingly assisting in and pursuing false allegations against them.

159.    All charges against Merault Almonor were resolved in his favor.

160.    The charges of disorderly conduct and resisting arrest against Wilma Almonor were resolved in her favor.

161.    By virtue of the foregoing, the Individual Officer Defendants each deprived Merault Almonor and Wilma Almonor of their rights under the Fourth and Fourteenth

Amendments to be free from unreasonable seizures and to liberty and due process, and are liable to Plaintiffs under 42 U.S.C. § 1983.

**SEVENTH CAUSE OF ACTION**
**42 U.S.C. § 1983 –Fourteenth Amendment Violations**
***On Behalf of all Plaintiffs for Violations of Their Due Process and Equal Protection Rights***
**(Against the Individual Officer Defendants)**

162.    Plaintiffs repeat and re-allege paragraphs 1 through 161 as if fully set forth herein.

163.    While in the course of their duties and under color of law, the Individual Officer Defendants effected seizures and arrests of Merault Almonor and Wilma Almonor on the basis of their race when they were attempting to do nothing more than retrieve their 13-year-old son— who had committed no crime and no violation—from police custody. In effecting these seizures and arrests, defendants intentionally and without reason used excessive force and deliberately humiliated each of them. By their actions, defendants deliberately caused Merault Almonor and Wilma Almonr to fear for their safety and well-being.

164.    While in the course of their duties and under color of law, Sergeant Korabel and Officer Dennis arrested Devin Almonor on the basis of his race without cause and intentionally humiliated him and did so despite their knowledge that he, as a juvenile, was particularly vulnerable to harm. By their actions toward him and toward his parents, defendants deliberately caused Devin Almonor to fear for his safety and well-being.

165.    Upon information and belief, defendants' purpose in using intentional force against and deliberately humiliating Plaintiffs and intentionally causing them to fear for their safety and well-being served no legitimate police purpose.

166.    The Individual Officer Defendants held each of the Plaintiffs in police custody for extended periods of time without reason or cause.

31

167.    The Individual Officer Defendants actions as herein described shock the conscience.

168.    By virtue of the foregoing, the Individual Officer Defendants each deprived Plaintiffs of their Fourteenth Amendment rights under the United States Constitution to substantive and procedural due process and to equal protection under the law and are liable to Plaintiffs under 42 U.S.C. § 1983.

## EIGHTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fifth and Fourteenth Amendment Violations
***On Behalf of Merault K. Almonor and Wilma Dore Almonor for Fabrication of Evidence***
**(Against the Individual Officer Defendants)**

169.    Plaintiffs repeat and re-allege paragraphs 1 through 168 as if fully set forth herein.

170.    The Individual Officer Defendants fabricated allegations of assault, obstruction of governmental administration, resisting arrest, and trespass against Wilma Almonor, beginning with her March 20, 2010, arrest and continuing through her trial and post-trial proceedings, including but not limited to intentionally and maliciously deceiving the District Attorney, Grand Jury, and the Jury.

171.    The Individual Officer Defendants fabricated allegations of assault and obstruction of governmental administration against Merault Almonor, beginning with his March 20, 2010, arrest and desk appearance ticket and continuing through his trial, including but not limited to intentionally and maliciously deceiving the District Attorney and Grand Jury, and attempting to deceive the Jury.

172.    By virtue of the foregoing, the Individual Officer Defendants each deprived Merault Almonor and Wilma Almonor of their Fifth and Fourteenth Amendment rights under the

United States Constitution to due process and to a fair trial and are liable to Plaintiffs under 42 U.S.C. § 1983.

## NINTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – Failure to Intervene
### *On Behalf of All Plaintiffs*
### (Against the Individual Officer Defendants)

173.     Plaintiffs repeat and re-allege paragraphs 1 through 172 as if fully set forth herein.

174.     Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the NYPD violating the constitutional rights of a civilian.

175.     As described herein, the Individual Officer Defendants each witnessed NYPD officers violating Plaintiffs' constitutional rights and each failed to intervene, halt, or protect Plaintiffs from the deprivation of their First, Fourth, and Fourteenth Amendment rights under the United States Constitution.

176.     The stop and frisk of Devin Almonor was clearly without reasonable suspicion and without justification, yet Sergeant Korabel and Officer Dennis failed to take any action or make any effort to intervene, halt, or protect Devin Almonor from being unlawfully stopped and frisked.

177.     The arrests of Merault Almonor, Wilma Almonor, and Devin Almonor, and the excessive force used against each of them, were clearly without probable cause or other legal justification and, in the case of Merault Almonor and Wilma Almonor, in retaliation for their having protested and questioned the police officers' actions, yet the Individual Officer Defendants failed to take any action or make any effort to intervene, halt, or protect Plaintiffs from these constitutional deprivations.

178.   By virtue of the foregoing, the Individual Officer Defendants each failed to intervene in the deprivation of Plaintiffs First, Fourth, Fifth, and Fourteenth Amendment rights under the United States Constitution and are liable to Plaintiffs under 42 U.S.C. § 1983.

**TENTH CAUSE OF ACTION**
**42 U.S.C. § 1985(3) – Conspiracy to Violate Civil Rights**
***On Behalf of All Plaintiffs***
**(Against the Individual Officer Defendants)**

179.   Plaintiffs repeat and re-allege paragraphs 1 through 178 as if fully set forth herein.

180.   While in the course of their duties and under color of law, Sergeant Sanders, Officer Dennis, Officer Diaz-Montez, and John Does 1-10 conspired to injure and damage Plaintiffs because of defendants' race-based animus against persons of color in violation of 42 U.S.C. § 1985(3).

181.   In furtherance of this conspiracy, the Individual Officer Defendants each subjected Plaintiffs to unlawful acts thereby depriving Plaintiffs of their rights to equal protection and equal privileges and immunities under the law in contravention of the Fourteenth Amendment of the United States Constitution.

182.   The Individual Officer Defendants each committed the foregoing acts intentionally, willfully, and with malicious disregard for Plaintiffs' rights and are therefore liable for punitive damages.

**ELEVENTH CAUSE OF ACTION**
**42 U.S. C. § 1986 – Neglect to Prevent Conspiracy to Violate Civil Rights**
***On Behalf of all Plaintiffs***
**(Against the Individual Officer Defendants)**

183.   Plaintiffs repeat and re-allege paragraphs 1 through 182 as if fully set forth herein.

184.   Sergeant Sanders, Officer Dennis, Officer Diaz-Montez, and John Does 1-10, having knowledge of the conspiracy and of the wrongs about to be done to injure Plaintiffs and

having the power to prevent or aid in preventing those wrongs, neglected and failed to do so in violation of 42 U.S.C. § 1986.

185.    By reason of their lack of reasonable diligence in preventing the wrongs to be done to injure Plaintiffs, the Individual Officer Defendants are each liable for all damages resulting from those wrongful acts.

## TWELFTH CAUSE OF ACTION
### 42 U.S. C. § 1983 – Individual Supervisory Liability
### *On Behalf of All Plaintiffs*
### (Against Korabel and Sanders)

186.    Plaintiffs repeat and re-allege paragraphs 1 through 185 as if fully set forth herein.

187.    Defendants Korabel and Sanders were, at all relevant times, sergeants and supervisory personnel in the NYPD, with oversight responsibility for the training, instruction, supervision, and discipline of Officer Dennis, Officer Diaz Montez, and John Does 1-10, who deprived Plaintiffs of their federal constitutional rights.

188.    Defendants Korabel and Sanders knew or should have known that Officer Dennis, Officer Diaz Montez, Officer Lopez, Officer Chang, and John Does 1-10 posed a risk of violating and, as described herein, were in the act of violating Plaintiffs' constitutional rights. Indeed, as described herein, defendants Korabel and Sanders each personally participated in the violation of Plaintiffs' constitutional rights.

189.    Defendants Korabel and Sanders knew, or in the exercise of due diligence should have known, that the actions taken against Plaintiffs by Officer Dennis, Officer Diaz Montez, Officer Lopez, Officer Chang, and John Does 1-10 were likely to occur.

190.    Defendants Korabel and Sanders knew, should have known, and/or recklessly and/or deliberately disregarded a culture of tolerance for excessive force and disrespect for the

community that exists and existed at the 30th precinct, as evidenced by, *inter alia*, the Mollen Commission Report and Exhibit 1 hereto.

191.    Defendants Korabel and Sanders were personally involved in ordering and/or failing to take preventative or remedial measures to guard against Plaintiffs' constitutional deprivations, including but not limited to endorsing, encouraging, and/or failing to prevent or remedy the culture of tolerance for excessive force and disrespect for the community that exists and existed at the 30th precinct, as evidenced by, *inter alia*, the Mollen Commission Report and Exhibit 1 hereto.

192.    The failure of Defendants Korabel and Sanders to train, supervises, and/or discipline Officer Dennis, Officer Diaz Montez, Officer Lopez, Officer Chang, and John Does 1-10 with respect to the constitutional rights of civilians amounted to gross negligence, deliberate indifference, and/or intentional misconduct which directly and proximately caused the injuries and damages to Plaintiffs set forth herein.

### THIRTEENTH CAUSE OF ACTION
#### New York State Constitution
#### *On Behalf of All Plaintiffs*
#### (Against the City and the Individual Officer Defendants)

193.    Plaintiffs repeat and re-allege paragraphs 1 through 192 as if fully set forth herein.

194.    The Individual Officer Defendants each subjected Plaintiffs to the foregoing acts and omissions without due process of law, thereby depriving Plaintiffs of rights, privileges, and immunities secured by Article 1, §§ 1, 6, 11, and 12 of the New York State Constitution, including, without limitation, the following deprivations of their rights, privileges, and immunities:

a. Plaintiffs were deprived of rights and privileges secured to them as a citizens of the State of New York, in violation of New York State Constitution Article 1, § 1;

b. Plaintiffs were deprived of their rights to due process, in violation of New York State Constitution Article 1, § 6;

c. Plaintiffs were deprived of their rights to equal protection under the law and were subjected to discrimination based on their race, in violation of New York State Constitution Article 1, § 11; and

d. Plaintiffs were deprived of their rights to be free from unreasonable searches and seizures, in violation of New York State Constitution Article 1, § 12.

## FOURTEENTH CAUSE OF ACTION
### New York Common Law
### *On Behalf of All Plaintiffs*
### (Against all Defendants)

195.    Plaintiffs repeat and re-allege paragraphs 1 through 194 as if fully set forth herein.

196.    By the actions described above, the City and each and every Individual Officer Defendant, jointly and severally, has committed the following wrongful acts against Plaintiffs, which are tortious under the laws of the State of New York:

a. Malicious prosecution;

b. False arrest;

c. Assault and battery;

d. Intentional infliction of emotional distress, in that, as described herein, defendants intended to and did cause Plaintiffs severe emotional distress, and the defendants' acts were outrageous in the extreme and utterly unacceptable in a civilized society;

197.    In addition, the City acted negligently, recklessly, knowingly, and/or willfully in hiring, screening, training, supervision, and/or retaining of the Individual Officer Defendants,

37

including but not limited to endorsing, encouraging, and/or failing to prevent or remedy the culture of tolerance for excessive force and disrespect for the community that exists and existed at the 30th precinct, as evidenced by, *inter alia*, the Mollen Commission Report and Exhibit 1 hereto.

198.    The foregoing acts and conduct of defendants were a direct and proximate cause of injury and damage to Plaintiffs and violated the common law rights guaranteed to them by the law of the State of New York.

## FIFTEENTH CAUSE OF ACTION
### Respondeat Superior
### *On Behalf of All Plaintiffs*
### (Against the City of New York)

199.    Plaintiffs repeat and re-allege paragraphs 1 through 198 as if fully set forth herein.

200.    The Individual Officer Defendants were employees of the City at the time of the incidents alleged herein and each was acting at all relevant times within the scope of his or her employment with the City.

201.    The City is therefore vicariously liable for the tortious acts as described and alleged herein of the Individual Officer Defendants under the common law doctrine of respondeat superior.

## DEMAND FOR JURY TRIAL

202.    Plaintiffs hereby demand a jury trial to the extent the law so permits.

**WHEREFORE,** Plaintiffs pray that the Court will:

1) Issue a judgment declaring that the NYPD's policy, practice, and/or custom of suspicionless stops and frisks such as the one of Devin K. Almonor challenged herein violates the Fourth and Fourteenth Amendments to the United States Constitution and

the Constitution and laws of the State of New York, and that its implementation, enforcement and sanctioning by NYPD officers is a direct and proximate result of the following policies, practices, and/or customs of the City:

    a. Failing to adequately screen, train, and supervise NYPD officers;

    b. Failing to adequately monitor the NYPD and its officers and discipline those NYPD officers who violate the constitutional rights of residents in communities they patrol; and

    c. Encouraging, sanctioning, and failing to rectify the NYPD's unconstitutional stops and frisks.

2) Issue an order for the following injunctive relief:

    a. Enjoining the NYPD from continuing its policy, practice, and/or custom of suspicionless stops and frisks;

    b. Enjoining the NYPD from continuing its policy, practice, and/or custom of conducting stops and frisks based on racial and/or national origin profiling;

    c. Enjoining the use of formal or informal productivity standards or other de facto quotas for arrests or stops and frisks by NYPD officers;

    d. Requiring the City to institute and implement improved policies and programs with respect to training, discipline, and promotion designed to eliminate the NYPD's policy, practice, and/or custom of suspicionless stops and frisks;

    e. Requiring the City to deploy NYPD officers with appropriate and adequate supervision;

    f. Requiring the City to institute and implement appropriate measures to ensure compliance with departmental directives that NYPD officers complete UF-250's on each and every stop and frisk they conduct; and

    g. Requiring the City to periodically and regularly review UF-250 forms and audits conducted of the NYPD's stops and frisks to determine whether reported stops and frisks have comported with constitutional requirements.

3) Award Plaintiffs compensatory damages against defendant the City of New York in an amount that is fair, just, and reasonable, to be determined at trial, including but not

limited to damages for damages for legal fees, costs and expenses associated with defending the criminal proceedings against Merault Almonor and Wilma Almonor, physical injuries, loss of liberty, lost employment and wages, loss of reputation, legal fees, costs and expenses, mental anguish, pain and suffering, inconvenience, humiliation, and fear;

4) Award Plaintiffs damages against Sergeant Sanders, Sergeant Korabel, Officer Dennis, Officer Diaz Montez, and John Does 1-10 to the extent their liability is based upon actions taken in their individual capacities, in an amount that is fair, just, and reasonable, to be determined at trial, including but not limited to damages for damages for legal fees, costs and expenses associated with defending the criminal proceedings against Merault Almonor and Wilma Almonor, physical injuries, loss of liberty, lost employment and wages, loss of reputation, legal fees, costs and expenses, mental anguish, pain and suffering, inconvenience, humiliation, and fear;

5) Award Plaintiffs punitive damages against Sergeant Sanders, Sergeant Korabel, Officer Dennis, Officer Diaz Montez, and John Does 1-10 to the extent their liability is based upon actions taken in their individual capacities, in an amount that is fair, just, and reasonable, to be determined at trial;

6) Award Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

7) Award Plaintiffs costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

8) Award Plaintiffs such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated: New York, New York
      June 17, 2011

Joel B. Rudin
**THE LAW OFFICES OF JOEL B. RUDIN**
200 West 57th Street, Suite 900
New York, New York 10019
(T) (212) 752-7600
(F) (212) 980-2968
jbrudin@aol.com

Myron Beldock
Jonathan C. Moore
Jennifer Rolnick Borchetta
**BELDOCK LEVINE & HOFFMAN LLP**
99 Park Avenue, Suite 1600
New York, New York 10016
(T) (212) 490-0400
(F) (212) 557-0565
mbeldock@blhny.com
jmoore@blhny.com
jborchetta@blhny.com

*Attorneys for Plaintiffs*

# EXHIBIT 1



House of Pain Logo.Comes in black or green $12
October 11, 2010


Theresa Mahlstadt
like Warrior Dash.


Warrio
Like

of 3

Chat (14)

Precinct Shirts                                     http://www.facebook.com/pages/Nanuet-Emergency-Medical-Services...



of 3                    Punisher emblem w/ perp sayings on back. Grey $12           Theresa Mahlstadt
                        October 11, 2010                                            like Warrior Dash.

                                                                                     Warrio
                                                                                                         Like

Chat (14)

30 Pct Tee Shirt

http://www.facebook.com/photos.php?id=150087089739



of 3

back

April 19, 2010

 **Michael Rodriguez** how do i get one?
April 20, 2010 at 12:38pm

**Social Work Jobs**
msw.usc.edu

 Soc
and
Ear
fron
Sou

Chat (14)

4/7/2011 4:58 PM